Alan M. Mansfield, SBN: 125998
WHATLEY KALLAS LLP
16870 W. Bernardo Drive
Suite 400
San Diego, CA, 92127
Phone: (619) 308-5034
Fax: (888) 341-5048
Email: amansfield@whatleykallas.com

John W. Hanson, SBN: 214771
THE HANSON LAW FIRM
548 Market St., PMB 53441
San Francisco, CA 94104-5401
Phone: (858) 451-0291
Fax: (858) 451-0281
Email: john@thesandiegolemonlawyer.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN LIOU, a Natural Person, on behalf of himself and all others similarly situated and for the benefit of the general public, | Case No. 3:20-cv-01077-CAB-DEB |
| Plaintiff, | **SECOND AMENDED COMPLAINT** <br> **CLASS ACTION** |
| v. | DEMAND FOR JURY TRIAL ON ALL CAUSES OF ACTIONS SO TRIABLE |
| ORGANIFI, LLC., a California Limited Liability Company, ANDREW CANOLE, a Natural Person, and DOES 1 through 20, inclusive, | |
| Defendants. | |

Plaintiff, on behalf of himself and all others similarly situated, upon personal knowledge as to his own acts and status as specifically identified herein, and otherwise upon information and belief based upon investigation as to the remaining allegations, hereby files this Second Amended Complaint ("Complaint" or "SAC") and alleges as follows against Defendants ORGANIFI, LLC, a California limited

liability company, Andrew Canole, a natural person, and DOES 1 through 20, inclusive:

## SUMMARY OF CLAIMS

1.    For several years, Organifi LLC ("Organifi") has manufactured, distributed, promoted, advertised and/or sold a product under the brand name Organifi Green Juice ("Green Juice" or "Product") to consumers, uniformly asserting that the efficacy of the Product was established and supported by numerous or countless clinical trials and studies sponsored by a prestigious medical university and published on a prominent government website. It was not. Plaintiff thus brings this action under California law, based on Defendants' food labeling practices that are both (a) unlawful and (b) deceptive and misleading to consumers.

2.    As detailed below, Defendants package and label these Products in violation of California's Sherman Food, Drug & Cosmetic Law, California Health & Safety Code §110000 *et seq.* ("Sherman Law"), which adopts, incorporates, and is identical in the respects relevant here to the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA") and the Food Dietary Supplement Health and Education Act ("DSHEA"). Identical California and federal laws regulate the content of labels on packaged food products and require truthful, accurate information on the labels of packaged food products. The relevant FDCA requirements set forth herein and under DSHEA were adopted by the Sherman Law. Under both the Sherman Law and FDCA, as well as Section 5 of DSHEA, food is considered "misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. §343(a). Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading. If any representation in the labeling is misleading, the entire food is considered misbranded, and no other statement in the labeling can cure a misleading

SECOND AMENDED COMPLAINT

statement. Such misrepresentations and omissions of material fact by Defendants render the Products sold by Defendants "misbranded."

3.      Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, held or sold in and from this State. Misbranded products thus have no economic value and are legally worthless. Indeed, the sale, purchase or possession of misbranded food is a criminal act in California, and the FDA even threatens food companies with seizure of misbranded products. This "misbranding," standing alone without any allegations of deception by Defendants other than the failure to disclose the material fact that the Product was illegal to sell, constitutes an "unlawful" business practice and renders Defendants strictly liable to Plaintiff, members of the Class and/or for the benefit of the general public. Purchasers of misbranded food in general and the Product in particular are thus entitled to a full refund of their purchase price.

4.      In response to such representations and omitted material facts, consumers purchased Organifi Green Juice and suffered damage. Plaintiff reviewed the labels on the Products that he purchased, reasonably acted in positive response to the claims such Products were supported by clinical trials and was thereby deceived. Plaintiff did not know, and had no reason to know, that Defendants' Products were misbranded as that term is defined under the Sherman Law. Moreover, the very fact that Defendants sold such illegal Products and did not disclose this material fact to consumers is a deceptive act in and of itself. Plaintiff would not have purchased a Product that is illegal to own or possess at the price he did, if at all. Similarly, Plaintiff did not know, and had no reason to know, that Defendants' product labels were false and misleading in that they were not supported by clinical trials or studies. Had Defendants informed Plaintiff of this material fact, there would have been no purchases at such prices. Plaintiff and members of the Class who purchased these Products thus also paid an unwarranted premium for these Products, which by law were worthless.

# **PARTIES**

5.    As used in this Complaint, the word "Plaintiff" shall mean Glenn Liou, a natural person.

6.    As used in this Complaint, the word "Defendants" when used without reference to a specific named Defendant shall mean Defendants Organifi, LLC, a California limited liability company, Andrew Canole, a natural person ("Canole") and DOES 1 to 20. Organifi is a limited liability company that is based in California, with its principal place of business and corporate office located at 7535 Metropolitan Drive, San Diego, CA 92108. It is active and in good standing according to the records of the California Secretary of State. Mr. Canole is an individual residing in the State of California and in this County. He is the founder, manager and primary promoter of Organifi and Organifi products, including the Products at issue herein, and as set forth below is featured in directly making numerous of the material claims at issue herein.

7.    Plaintiff is currently ignorant of the true names and capacities of the Defendants sued under the fictitious names DOES 1 to 20. They are sued pursuant to Code of Civil Procedure Section 474. When Plaintiff becomes aware of the true names and capacities of the Defendants sued as DOES 1 to 20, Plaintiff will identify them and/or amend this Complaint to state their true names and capacities. At all times mentioned herein, each defendant, whether actually or fictitiously named as DOES 1-20 in this Complaint, was the principal, agent or employee of each other defendant, and in acting as such principal, or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth, by reason of which each defendant is liable to Plaintiff and the proposed class and/or for the benefit of the general public for the relief prayed for herein. At all times relevant herein, each defendant ratified the unlawful conduct of the other defendants, their agents and employees, by failing to repudiate the misconduct and by accepting the benefits of the transactions in question with

knowledge of the wrongdoing and thereby aided, abetted, and/or ratified the violations of law alleged throughout this Complaint. Defendants DOES 1-20 are persons who are in a position of responsibility in terms of impacting or controlling the actions of Organifi, which allows them to influence business policies or the activities of Organifi and/or the other Defendants in this action. There is a nexus between their involvement in the conduct in question and the violations of law alleged herein such that they could have influenced the actions that constituted the violations of law that form the basis for this action. Their actions or inactions facilitated the violations alleged herein.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under Article VI, Section 10 of the California Constitution and Code of Civil Procedure Section 410.10. Jurisdiction is also proper under Business & Professions Code Section 17203 of the Unfair Competition Law ("UCL"), as such claims can be brought in any court of competent jurisdiction. Jurisdiction over Defendants is proper because they are either corporations or associations organized and existing or with their principal or primary places of business located in the State of California or are residents of this State and/or have purposely availed themselves of the privilege of conducting business activities in California because they currently maintain systematic and continuous business contacts with this State, are licensed to do business in this State and/or have liability based on the allegations of conspiratorial conduct and aiding and abetting as set forth in this Complaint.

9.     Venue is proper in this County because Defendants conduct business in the State of California and in this County from the corporate address listed above and/or reside here, and further conduct from this County and State throughout the United States. Defendants' commercial activities in the State of California and this County include, but are not limited to, being based in this County, engaging in the marketing, sale and provision of goods and services in this

County and from this County throughout the United States, and undertaking transactions originating in this County. Venue is also proper in this Court because many Class members did business with Defendants and engaged in transactions in this County, and Defendants have received substantial profits from customers who engaged in transactions originating in this County.

10.    Plaintiff's Declaration of Venue as required under California Civil Code §1780(d), which avers that a significant part of the events or omissions giving rise to the claims alleged herein took place in this County, is attached hereto and filed herewith.

## CLASS ACTION ALLEGATIONS

11.    Plaintiff brings this action on behalf of himself and on behalf of a class of similarly-situated consumers, pursuant to Fed. R. Civ. Proc. Rule 23 and Cal. Civ. Code Section 1781, to challenge and remedy Defendants' unlawful and wrongful business practices.

12.    Plaintiff seeks relief for the following class of persons (the "Class"): All persons who have purchased the Products in the past four years other than for purposes of resale or distribution. The class period continues until such time as the notice is mailed to the Class or such other date as may be set by the Court.

13.    The Class does not include the Court assigned to this matter and its staff, and all employees of Defendants and their affiliates.

14.    The proposed Class is so numerous that the individual joinder of all its members in one action is impracticable. While the exact number and the identities of Class members are not known at this time, the number of Class members is likely in the tens of thousands in light of the claimed sales of Organifi products, which is estimated to currently be in excess of $50 million a year, for a product that sells for over $70 per order for a one month supply. Members of the Class are also identifiable, as Defendants would maintain records of such purchases since the sales of these Products are almost exclusively conducted online, and Defendants

would maintain or have access to shipping records of the Products sold to consumers.

15.    Questions of law and fact of common and general interest to the Class exist and predominate over any questions affecting only individual members of the Class. These common questions include, among others, the following:

a.    whether the Products are not supported by the numerous clinical trials and studies Defendants claim exist and published on a prominent government website and supported by a prestigious medical university;

b.    whether the Products are subject to the requirements of the Sherman Act, the FDCA, the UCL, the Consumers Legal Remedies Act, and the other laws referenced herein, and whether the Products are "misbranded" under state and federal law;

c.    when Defendants knew or should have known of the illegal and/or misleading nature of the claims at issue;

d.    whether Defendants had a reasonable basis for making such claims;

e.    whether Defendants' misrepresentations or omissions of fact were of a fact they were obligated to disclose and/or were material to consumers;

f.    whether Defendants' actions were unlawful, unfair, or fraudulent under the UCL and in violation of the state laws referenced herein;

g.    the amount of revenues and profits Defendants received or saved and/or the amount of monies or other obligations imposed on or lost by Class members as a result of such wrongdoing;

h.    whether Plaintiff and the Class members are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief, and, if so, what is the nature of such relief; and

i.    whether Plaintiff and the Class members are entitled to statutory, actual or exemplary damages and/or equitable monetary relief from Defendants

based on the causes of action asserted by them and, if so, what is the nature and appropriate measure of such relief.

16.    Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class members were injured by the same wrongful conduct and scheme of the Defendants alleged herein.

17.    Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff's interests are not antagonistic to or irreconcilably conflict with the interests of the members of the Class. Plaintiff is represented by attorneys who are competent and experienced in consumer class action litigation.

18.    A class action is superior to other available group-wide methods for the fair and efficient adjudication of this controversy because the individual damage and harm suffered by each individual Class member may be relatively small compared to the expense and burden of prosecuting such claims through an individual case. If individual Class members were required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

19.    Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or declaratory relief appropriate with respect to the Class as a whole.

20.    As the Products at issue are almost exclusively sold online, notice of the pendency of and any resolution of this action can be provided to the Class members by individual electronic notice or the best notice practicable under the circumstances.

## SUPPORTING FACTS

21.    On personal knowledge, or about January 29, 2019, Plaintiff placed an order for Organifi Green Juice, spending $72.90 for a one-month supply. He did so based on information disseminated by Organifi through its website, in which it specifically claimed on its corporate website or other websites controlled by Mr. Canole that the Product's efficacy is based on the results of clinical trials. Plaintiff purchased the Products as he cares about the nutritional content of food and seek to maintain a healthy diet, and the claims at issue about the Product being supported by clinical trials and studies were material to him, and thus acted in positive response to such statements and claims. Plaintiff consumed the Product according to the Product directions but did not receive any of the claimed benefits of the Product. In addition, one of the claimed benefits that was important to Plaintiff was that the Product's efficacy had been established by numerous clinical trials published on a prominent government website and supported by a prestigious medical university, which he later determined were untrue and misleading.

22.    The following is an example of an online advertisement for Organifi Green Juice:



23.    On the box accompanying the Product, it states:

QUESTIONS? COMMENTS?

760.487.8587 / ORGANIFI.COM

And on the label of each single packet label, there is a reference:

"see ORGANIFI.COM."

24.    Organifi's website Organifi.com is thus incorporated into the label of the Products. According to the FDA, a website reference is part of the labeling of any product bearing these web addresses because it is incorporated into the label and thus accompanies a label of product within the meaning of 21 U.S.C. Section 321(m). As the reference explains or supplements information available about the Products, this reference creates a connection between the Products and the relevant statements about the Products on these websites and thus is part of the Product labeling. In addition, Defendants promote the Products on these websites and allow consumers to purchase the Products directly from these websites, thus making them designed for use in the distribution and sale of the Products and also constituting product labelling

25.    As an initial matter, "Green Juice" is not a juice. It is a powder that is added to water or other liquids. Nor is there any claim by Defendants that by adding the powder to water the user is creating "juice." It is markets as a nutritional supplement.

26.    Defendants also represented uniformly on the Organifi website (organifishop.com) that there is clinical evidence supporting the use of Organifi Green Juice, as compared to simply its underlying ingredients. By way of example, at    https://fitlife.tv/organifi-green-juice-has-been-shown-to-check-this-out-now/, information Organifi has publicly distributed through a website of a company Mr. Canole is the founder of and CEO for and that acts as an advertising arm for Organifi, Defendants claim "Organifi Green Juice Has Been Shown To… (check this out now!)," which then supposedly refers to clinical trials supporting the efficacy of Organifi Green Juice. However, this statement is untrue or misleading as there is no associated link to any clinical trials at the 'check out this link' reference.

27.     According to this website and at organifishop.com, Mr. Canole personally represents: "There was outstandingly positive (statistically significant) results for those participants that took 2 or more servings of Organifi daily (more is better and is clinically proven)," and "It's a great time to invest in your health and I am eager to share with you the findings of these clinical trials… ." Mr. Canole is personally featured on this site and is featured in a video located on this site where he uniformly states that he has received and reviewed such results, and claims to be actually reviewing the clinical study results on camera during this advertising presentation.

28.     When consumers click on the link to these clinical trials on Organifi's website, consumers are directed to https://clinicaltrials.gov/, but with no direction regarding what to search for. There is no link to any particular study. And if one searches for Organifi or Green Juice at that site, there are no listed clinical trials or results for Organifi Green Juice at all. Thus, it is untrue or misleading for Defendants to assert in any of its advertising that such studies have been listed on a prominent government website, when in fact no such studies have been published. This fact would be material to the reasonable consumer because this site only publishes studies that have been established to be truly clinical trials or studies and is the only government website that publishes clinical studies and trials. As a result, consumers would likely be satisfied by knowing such studies are published there without needing to do any further research or investigation.

29.     Defendants        also        uniformly        represented        at https://www.organifishop.com/blogs/news/organifi-green-juice-has-been-shown-to-check-this-out-now: "Because we are committed to creating only the highest quality products possible, we sent our Green Juice to Georgetown University Medical Center in Washington D.C. so that a third party could test the effectiveness and benefits of our Organifi Green Juice."

30.    However, when consumers clicked on the link within that page to "Georgetown University Medical Center," they were directed to https://gumc.georgetown.edu/. Again, no clinical trials or studies are listed or available for review when they search for Organifi or Green Juice on that website. If one searches for "Dietary Supplement Georgetown" on clinicaltrials.gov, there is a study from Dr. Harry Preuss[1], but that study appears to have nothing to do with testing either the Product or any other Organifi products, and Dr. Preuss has his own independent business (discussed below). Thus, it is untrue or misleading for Defendants to assert in its advertising that any "clinical" study or trial of Organifi was sent to Georgetown University Medical Center for it to test the effectiveness and benefits of this product, or was overseen, conducted, approved, sponsored or affiliated with Georgetown University Medical Center. This claim is fundamentally different than being conducted by an unaffiliated company that has someone on their advisory board from that University. The fact that the clinicaltrials.gov site would publish studies conducted by a prominent U.S. medical university, and thus would only publish truly clinical trials or studies that were overseen by that particular university, would be material to the reasonable consumer. As a result, consumers would likely be satisfied by knowing such studies are published there without needing to do any further research or investigation.

31.    Thus, when Defendants publicly represent that consumers should buy this Product based on results that are "clinically proven" or subject to "clinical trials" conducted at Georgetown University Medical Center and published at clinicaltrials.gov, where no studies of Organifi products in general or the Product in particular that would qualify as clinical trials or studies are available for review at those sites or sponsored by that university, such claims are false or misleading.

---

[1] https://clinicaltrials.gov/ct2/show/NCT01107431?
term=Dietary+Supplement+Georgetown&rank=2 (last accessed October 21, 2020)

32.    Separate and independent from the misstatements of material fact regarding the existence of studies on clinicaltrials.gov and conducted by the Georgetown University Medical Center and under its auspices, Defendants have made numerous specific claims as to the efficacy of its Product for the treatment, prevention or cure of a wide variety of conditions. The following is a representative sample of the advertising and promotional claims made by Defendants that the Product would treat, prevent or cure a number of different conditions. Such statements are contained on the websites either owned or controlled by Defendants and have been present during at least the past year. As this information is in Defendants' hands as to when statements were included on their websites, they have the information to determine when such statements were made:

    (a)   "Detoxify -- Drink this for a Cleansing Daily Detox", with a picture of Organifi Green Juice (Facebook ad);

    (b)   "The Organifi Trim Down System - Optimal nutrition for weight management," with a picture of Organifi Green Juice, Organifi Red Juice, Organifi Complete Protein All-In-One Mix, Super Foods That Target Fat (Facebook ad);

    (c)   "The Organifi Complete Health System … 30 days to feel like a new person," with a picture of Organifi Probiotic, Organifi Complete Protein All-In-One Mix, Organifi Green Juice, Organifi Gold, Organifi Red Juice and 2019 Organifi Complete Health System (Facebook ad);

    (d)   "And for those that haven't quite made the move, check out what the 3rd party clinical trials have shown (if this doesn't entice you to take a step towards health, I don't know what will). This is so exciting!" (https://www.organifishop.com/blogs/news/organifi-green-juice-has-been-shown-to-check-this-out-now);

(e)    "MENTAL CLARITY… Feel incredible **energy** and **focus** that lasts all day long. Magnify your energy and **boost your brain power**" (https://www.organifi.com/green-juice-mobile/);

(f)    "REDUCE STRESS… **Balance hormones** already within normal range and reduce yourself from frustrations and stress." (https://www.organifi.com/green-juice-mobile/);

(g)    "DETOXIFY… **Flush out toxins** and xenoestrogens that are causing your body to hold onto unwanted weight" (https://www.organifi.com/green-juice-mobile/)

(h)    "REJUVENATE YOUR SKIN… Glowing, healthier, **younger looking** skin, hair and nails" (https://www.organifi.com/green-juice-mobile/);

(i)    "BOOST IMMUNITY… Packed with nature's most powerful superfoods, and is loaded with vitamins and minerals to help **boost immunity**" (https://www.organifi.com/green-juice-mobile/);

(j)    "After intense research, testing and comparison Organifi brings you the perfect combination of the most incredibly potent and effective life changing superfoods" (https://www.organifi.com/green-juice-mobile/);

(k)    "Can This Delicious Elixir *REALLY* Ease Stress, Boost Energy and <u>ERASE</u> Belly Fat?... **reduces the primary belly fat hormone by 27%** in less than 90 seconds" (https://www.organifi.com/2-vsl-only-cb-1/);

(l)    "You're about to discover a simple solution to **cool, calm and rebalance your hormones**, quickly erasing impossible to lose belly fat by targeting it in 3 different ways – all at the same time" (https://www.organifi.com/2-text-only-cb/);

(m) "Fair warning -- everything I [Mr. Canole] says is backed up by hard science. That means you won't find any ridiculous unsubstantiated claims here." (https://www.organifi.com/2-text-only-cb/);

(n) "A brand new 30-second solution that makes it EASY for you to automatically burn off fat… keep your metabolism in peak condition, and keep your energy levels sky-high all through the day." (https://www.organifi.com/green-juice-mv1-text/);

(o) "cleansing your body from the inside out… detoxifying ... de-stressing … and naturally and effortlessly melting away stubborn layers of fat… I'm [Mr. Canole] so sure you're going to love not just the taste, but the real, visible results to your body, health and physique … that if you **order right now** you can "taste-test" **Organifi** for a full 30 days with zero risk or obligation. In fact, I *guarantee* you'll lose significant weight… gain more energy… feel calmer, more relaxed and experience a sharper, clearer mind…" (https://www.organifi.com/1-text-and-vsl-cb/);

(p) Clinical Trials Report: Green Juice Improves Depression"—In a third party clinical trial, our very own Organifi Green Juice Power has been shown to help improve symptoms of depression. Participants of this trial were asked to drink 2 servings of Organifi every day. The Beck Depression Scale was used to help participants rate their quality of life and levels of depression. At the end of the 90 day trial period, participants reported a positive change in depression symptoms and also their quality of life." (http://fitlife.tv/clinical-trials-report-green-juice-improves-depression/;

https://www.organifishop.com/blogs/news/clinical-trials-report-green-juice-improves-depression);

(q)    "Clinical Trial Reports: Green Juice Improves Blood Pressure: … In third party clinical trials, our very own Organifi Green Juice powder has been shown to support healthy blood pressure levels." (http://fitlife.tv/clinical-trial-reports-green-juice-improves-blood-pressure/digestion/;https://www.organifishop.com/blogs/news/clinical-trial-reports-green-juice-improves-blood-pressure);

(r)    "THIS ONE SIMPLE HABIT CAN LOWER CHOLESTEROL AND IMPROVE HEART HEALTH… In third party clinical trials, our very own Organifi Green Juice powder has been shown to significantly lower total cholesterol levels when taken twice daily over a 90-day trial period." (https://www.organifishop.com/blogs/news/this-one-simple-habit-can-lower-cholesterol-and-improve-heart-health);

(s)    "LOSE FAT WITH THESE 5 SCIENCE-BACKED METHODS… #1 – DRINK GREEN JUICE…. In third party clinical trials, our very own Organifi Green Juice has been shown to support healthy weight loss. Taking the recommended two servings per day or more was associated with a significant *reduction of excess body fat and increase in lean muscle mass.*" (https://www.organifishop.com/blogs/news/lose-fat-with-these-5-science-backed-methods);

(t)    "AYURVEDIC MEDICINE'S BEST KEPT SECRET – THE ANTI-STRESS HERB… Because of the unbeatable benefits ashwagandha provides, we chose it as one of our main ingredients in Organifi Green Juice Powder… In third party clinical trials, our very own Organifi Green Juice has been shown to support healthy cortisol levels when taken as recommended – two servings per day or more…" (https://www.organifishop.com/blogs/news/ayurvedic-medicines-best-kept-secret-the-anti-stress-herb).

33.    Such statements are false or misleading or likely to mislead reasonable consumers targeted by Defendants' conduct. For example, a misleading aspect of Defendants' claim that the Product "hydrates and revitalizes you while naturally balancing your hormones, helping your body deal with the effects of stress, boosting your immune function, and supporting mental clarity," while citing to various studies of the efficacy of the ingredients on their website, is that such claims are not based on a study of the Product, but of the ingredients in the Product. Most of these ingredients are contained within two proprietary blends, called the "Alkaline Greens Proprietary Blend" and "Super Food Proprietary Blend." However, use of these terms allows the company not to disclose how much of each ingredient is contained within the Product. This makes it impossible for a reasonable consumer to determine whether there is enough of the active ingredients to provide the suggested health benefits. And, as these ingredients come in proprietary blends, it's hard to know what their ratios are in the Product.

34.    In addition, these statements refer to "third party clinical trials." For the reasons stated above, the singular study referenced by Defendants does not even qualify as a clinical trial, let alone multiple trials. Thus, for this statement to not be false, Defendants would have to be relying on studies not of Green Juice itself, but of its component ingredients. There are advertising requirements and standards for using terms such as "clinically proven," "clinical trials" or "clinical studies" in advertisements, such as those promulgated by the Federal Trade Commission and/or the FDA, which include examples of when particular advertisements are considered misleading depending on the nature of the claims at issue. *See*, *e.g.*, https://www.ftc.gov/tips-advice/business-center/guidance/dietary-supplements-advertising-guide-industry; https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-evidence-based-review-system-scientific-evaluation-health-claims;                    and https://www.fda.gov/regulatory-information/search-fda-guidance-

documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food.

35.    The FDA and FTC Guidelines referenced herein give several examples of misleading advertising claims that refer to underlying ingredient studies that do not account for the amount of the ingredient in the product needed to show efficacy, or the quality of the study and its comparability to the product (such as interactions of ingredients). For example, according to the FDA in its "Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section $403(r)(6)$ of the Federal Food, Drug and Cosmetic Act[2], in order for such a claim to not be considered false and misleading the quantity of the ingredient in the product must be the same or similar to that contained in the study referenced for that ingredient.

36.    As set forth above, the Defendants' claims about the existence of any, let alone multiple, clinical trials establishing the efficacy of Green Juice as a standalone product are false and misleading.

37.    In addition, Defendants' claims about the efficacy of Green Juice based upon clinical studies of its constituent elements that they reference on their website making the claims set forth above are also false and misleading.

38.    While to date Defendants have refused to disclose the composition of the ingredients in Green Juice's "Alkaline Greens Proprietary Blend" and "Super Food Proprietary Blend", an analysis of the cited studies shows why such claims are false. The per serving gram size of Green Juice is 9 grams 1 or 2 times per day; the "Alkaline Greens Proprietary Blend", consisting of 6 different ingredients, is 5.1 grams, and the "Super Food Proprietary Blend", consisting of 4 different

---

[2] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food (last accessed October 21, 2020).

ingredients, is 1.45 grams –an average amount of less than a gram per serving of these ingredients.

39.    Defendants reference on their websites 18 allegedly "clinical trials"[3] that support the efficacy of the ingredients in Green Juice powder for a variety of conditions. It is false and misleading for Defendants to make such claims. Several of these are animal studies, not human clinical studies, and according to the FDA, animal physiology is different from human physiology and therefore the studies do not provide information that would provide for a relationship between a given substance and disease in humans.[4] In addition, the FTC and FDA Guidelines referenced herein do not permit a product to reference or rely upon as "clinical trials" studies of populations outside the United States, extrapolate general results from a study of a certain demographic such as elderly individuals, or that are based on an unduly small sample sizes without clear disclosure of such limitations – which Defendants fail to include for any of the cited studies. One of the cited studies concluded there was no association between the use of antioxidant supplements (which is what Green Juice would be) and decreased depression.  Two of the studies (e.g., for carrot juice and beetroot juice) are either for 16 fluid ounces (which translates to 454 grams) per day and 500 grams per day – significantly more than is contained in even two servings of Green Juice powder. Another, for green barley leaf, is for 400 milligrams per kilogram of weight, and would be at least 20 grams per serving; another, for Hesperidin, is for at least 5 grams per

---

[3] See references to websites set forth in Paragraph 32 above. See also https://www.organifishop.com/blogs/news/ayurvedic-medicines-best-kept-secret-the-anti-stress-herb; https://www.organifishop.com/blogs/news/clinical-trial-reports-green-juice-improves-blood-pressure; https://www.organifishop.com/blogs/news/clinical-trials-report-green-juice-improves-depression; fitlife.tv/the-shocking-truth-about-gut-health-and-probiotics/; https://www.organifishop.com/blogs/news/this-one-simple-habit-can-lower-cholesterol-and-improve-heart-health (last accessed October 22, 2020).

[4] *Guidance for Industry: Evidence-Based Review System for the Scientific Evaluation of Health Claims,* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-evidence-based-review-system-scientific-evaluation-health-claims (last accessed October 21, 2020).

kilogram of weight, which would be at least 250 grams per serving. One study for prebiotics FOC and B-GOS (which does not appear to be correlated to any of the specific listed ingredients in Green Juice) require a serving size of 5.5 grams per day. Adding just these amounts together show the Product in its current composition does not correlate to the ingredient levels necessary to obtain the promoted benefits, and thus it would be false for Defendants to claim these qualify as "clinical trials" that support the efficacy of Green Juice based on the ingredient levels contained in the Product. Most of the cited studies (such as for Citrulline, dietary nitrates and fruits and vegetables in general) contain no levels at all, state consumers should generally consume high levels or 2 to 7-plus servings of fruits and vegetables daily,[5] discuss the beneficial effects of a healthy diet in general that is not correlated to consuming Green Juice powder, state that at best they show a "promising treatment", "possible role" or "possible link" and that more or actual clinical studies are required. At least eight of the references are summaries that do not actually qualify as a clinical trial or study that substantiates the beneficial effects of the ingredients in Green Juice powder. And none of these references are consistent with the unequivocal claims made by Defendants as to the efficacy of the ingredients contained in Green Juice powder being supported by multiple clinical trials at the levels in the Product.

40.    A classic example why such references are false and misleading relates to Defendants' reference to the herb ashwagandha contained in Green Juice powder. Even though, according to Defendants, clinical studies support the efficacy of that herb to such a degree that "we chose it as one of our main ingredients in Organifi Green Juice Powder", none of the listed studies provided by

---

[5] A serving size or portion of a fruit or vegetable varies, but the average serving size is approximately 80 grams each. See http://www.fao.org/english/newsroom/focus/2003/fruitveg2.htm#:~:text=In%20order%20to%20monitor%20fruit,not%20included%20in%20this%20recommendation (last accessed October 21, 2020).

Defendants are of a clinical study of ashwagandha. There is only a link to a website for the Indian Medical Journal. And even if a consumer were diligent enough to search on that website for ashwagandha and could locate a study of that herb, what they would find is a single study that: (a) is of a limited Indian population (less than 65 people); (b) involved a limited demographic (individuals with a history of chronic stress but not other diseases); (c) were screened to exclude from the study persons taking other herbal preparations containing certain related herbs (and Green Juice is an herbal mixture) or using hormonal birth control measures; (d) were given a high concentration full spectrum root extract form of that herb; (e) were required to take the product in capsule form at 600 mg per day for 60 days; and (f) concluded that based on these limitations, larger clinical studies are required. Claiming this study is somehow a "clinical trial" that supports the efficacy of Green Juice as an "anti-stress" treatment without any limitations, disclosures or even direct references to any study is false and misleading, and doing so violates many of the guidelines referenced above for claiming a particular clinical trial or clinical study supports the efficacy of a product.

41.    Thus, for most if not all of the listed ingredients, a consumer would need to take a larger serving size than a scoop of Organifi Green Juice to experience any of the stated benefits, making it unlikely consumer will experience significant "weight loss, improved focus, balanced hormones, or improved sleep," as Defendants represent on their websites.

42.    In addition, 21 U.S.C. Section 343(r)(6) requires a manufacturer of dietary supplements making claims such as those at issue herein have a basis that the claim is truthful and not misleading to make sure that the cited support relates to the specific product and claim, is scientifically sound, and is adequate in the context of the surrounding body of evidence. The FTC guidelines require the

existence of competent and reliable scientific evidence to support such claims of clinical efficacy.

43.    Based on these widely used industry standards, the use or reference to the terms "clinical trials," "clinical studies," "clinically proven" or other similar statements in advertisements, which constitute the "gold standard" of proof and thus cannot be cavalierly used, require the existence of competent and reliable independent scientific evidence, including unbiased tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area that have been conducted and evaluated in an objective manner by persons qualified to do so and using procedures generally accepted in these professions to yield accurate and reliable results. These claims draw a logical connection between the claims that clinical studies exist and effectiveness as a treatment for a particular condition and thus result in a net impression that numerous clinical studies support or prove Defendants' claims as to the efficacy of the Products.

44.    Reference to an asterisk with standard DSHEA disclaimer DSHEA (at the bottom of a page, in small font that is not bolded and is discolored such that it cannot readily be seen or reviewed) that such statements have not been approved by the FDA and is not intended to diagnose, treat, cure or prevent any disease do not rebut this net impression, since the point of these material representations is intended to convey that numerous clinical studies of this particular Product exist and establish its efficacy for treatment, prevention or reduction of particular identified conditions, which is likely to mislead reasonable consumers. The FTC Guidelines referenced above also state "the inclusion of a DSHEA disclaimer or similar disclosure will not cure an otherwise deceptive ad, particularly where the deception concerns claims about the disease benefits of a product," and as an example provides as follows:

> "An advertisement for an herbal supplement includes strong, unqualified claims that the product will effectively treat or prevent diabetes, heart disease, and various circulatory ailments. The advertiser does not have adequate substantiation for this claim, but

includes the DSHEA disclaimer prominently in the ad. **In face of the strong contradictory message in the ad, the inclusion of the DSHEA disclaimer is not likely to negate the explicit disease claims made in the ad, and will not cure the fact that the claims are not substantiated**." (emphasis added).

Here, Defendants do not even prominently include such disclaimers in its promotional statements.

Thus, the occasional inclusion of such a disclaimer does not immunize Defendants from liability. This is particularly the case when reinforced by Defendants' references to clinical studies being available at clinicaltrials.gov and the Georgetown University Medical Center, both of which are untrue.

45.    To make such claims or references to terms such as "clinical trials," "clinical studies," "clinically proven" or other similar statements, the clinical trials that support such claims must also use procedures generally accepted in the profession to yield accurate and reliable results supported by sound science, such as through a randomized, controlled, double blind clinical study that was peer reviewed at some level. According to these applicable industry and government standards, clinical trials should also be scientifically sound and described in a clear, detailed protocol. Moreover, in order for a study to be considered an independent clinical study, it should be undisputed that the person who conducts that study should not have a vested interest in the outcome. Such statements convey the impression that the Product has been studied and also conveys the impression that there is a substantial body of competently conducted scientific research supporting this claim.

46.    However, the "clinical trial" primarily cited by Defendants that supposedly provided clinical trial support for Defendants' varied claims was conducted by three people: (1) Gilbert R. Kaats, PhD; (2) Harry G. Preuss, MD; and (3) Larry K. Parker, Sr., MD. Gilbert R. Kaats is the President and CEO of Integrative Health Technologies, a company located in Texas. Harry G. Preuss is on their "scientific advisory board." Larry K. Parker is an OBGYN in Texas. The study was apparently conducted through Integrative Health Technologies in Texas

23

and had no affiliation with Georgetown University Medical Center, other than that Mr. Preuss was a professor at Georgetown who claims to specialize in the general area of nutrition. None appear to have any expertise in the area of cardiovascular health or depression. The website for Integrative Health Technologies states: "Integrative Health Technologies, Inc's (IHTI) mission is use its scientific and testing resources, research and development experience, and financial resources to aid healthcare companies in the discovery, testing and marketing of their healthcare products and technologies. **In return for this support, IHTI receives equity or stock in the companies for whom it provided these services or royalties from the products and technologies it helped develop.**" (emphasis added). Thus, there was a significant incentive for Integrative Health Technologies to report positive results from the study because it could make more money through stock or royalties if the study results are positive.

47.     Moreover, it does not appear that there are multiple "clinical trials" that support these claims as Defendants stated, but instead one observational study. Forty (40) subjects participated in the study that supposedly provided the support for Defendants' claims that clinical trials established the efficacy of the Product for use to treat, reduce or prevent a wide variety of conditions – 10 males and 30 females. There appears to be no upfront hypothesis that was to be established by this study, such that the questions to be answered by the study were not clearly described at the outset. For 90 days, the participants were asked to consume two servings of Green Juice daily. The study participants were asked to self-report and provide daily reports of the number of servings of the Product they consumed each day of the study. Six subjects were "lost to follow-up" – one male and five females. This left only 34 subjects at the conclusion of the study (9 males and 25 females), who were then divided into 4 quartiles, meaning approximately 8 people total were in each quartile, with virtually meaningless differences between three of them (Q1=1.00 servings daily; Q2=1.74 servings daily; Q3=1.95 servings daily;

Q4=2.00 servings daily). Comparisons were made between each of these quartiles and Q4 on 25 outcome measures. Comparisons were also made between the sum of Q1-3 on the same 25 outcome measures. The 25 outcome measures included body composition, lipid profiles (for cholesterol), blood measures and pressure (for cardiovascular), and filling out a questionnaire for depression. Despite the minute difference in dosage there was no analysis of the difference between Q1 and Q2-Q4. Even then, there was no statistically significant reports of weight loss in any quartile, and only identified a claimed change in body composition index between Q4 versus Q1 and Q2. There were no statistically significant changes within groups Q1 to Q3 in 18 of the 20 objective measurements, which is important as Q2 was 1.74 servings per day, Q3 was 1.95 servings per day and Q4 was 2.0 servings a day, a difference no reasonable person could differentiate in terms of self-reporting or measurement or what would happen if a person varied between the quartiles in terms of use. The reports of significant differences for those who reported using 2 servings a day would only be results from 8 people who would have been in the Q4 quartile, meaning any alleged statistically significant results from using 2 servings per day would have only come from the self-reporting or results from 8 people. And of the 25 measured outcomes, only six supposedly had statistically significant results, and most of those were from self-reporting (*i.e.*, filling out a questionnaire). There were no statistically significant changes in blood pressure in Q4, the most compliant group. There were no statistically significant changes in blood pressure or blood lipid measures within quartiles Q1-Q3, which as noted above is virtually indistinguishable between Q2, Q3 and Q4 in terms of serving size. Even where there were alleged noted differences, the study admitted that the most compliant group (Q4) may have had increased motivation to pursue healthier lifestyles generally as compared to solely utilizing the Product, and thus "absent a placebo group, it is not possible to answer this question directly." None of these disclaimers or qualifications are directly referenced in this advertising, nor

does the advertising accurately convey to consumers the extent, nature or performance of the effects achieved in the studies and the level of scientific certainty of those effects, if any.

48. This "clinical trial" that supposedly established the efficacy of the Product for cardiovascular issues, cholesterol, depression, blood pressure and other issues only involved a statistically insignificant number of participants (34 people from Texas, many of whom could have been patients of Dr. Parker in light of the fact 75% were women) that likely were not randomly selected or representative of the population that is similar to that consuming the Product. The "clinical trial" included no control group, admittedly no placebo group, no double blinding, and no randomization. The "clinical trial" used quartile groups separated by meaningless distinctions, where less than 25% of the items measured had any significance and involved approximately16 people total in Q1 vs. Q4, all of which admittedly could have been caused by other factors such that other possible concurrent changes that could account for the outcome were identified, assessed and/or controlled. The results were not replicated or based on multiple studies of the Product, and the study was conducted by a company with a vested financial interest in the outcome and does not appear to have been subjected to any level of peer review. A single statistically flawed non controlled company sponsored study does not fall within the requirements of a "clinical study" or "clinical test", and even the reported results are inconsistent with the broad claims made by Defendants, examples of which are set forth above. It thus does not constitute competent and reliable scientific evidence that would satisfy the requirements for making such claims, nor satisfy the accepted norms for the relevant research fields on the effective of the Product for the treatment, prevention, reduction or cure of the conditions represented by Defendants.

49. Observational studies based on customer surveys or self-reports do not qualify for such support as it would not in and of itself constitute competent

and reliable scientific evidence. This study of the Product fails virtually all of the accepted industry standards for an intervention or observational study, let alone those applicable to the gold standard of "clinical trials" that Defendants claim that study is:

*Were the studies randomized and blinded and was a placebo provided?* Appropriate randomization eliminates intrinsic and/or extrinsic factors, other than the substance, that could have an influence on the outcome of the study. Blinding is especially important when the endpoint can be influenced by a subject's awareness that he or she is receiving something that may be beneficial. Blinding would be critical when the outcome measure is cognitive performance, mental status (e.g. memory, depression), or behavior. Including a placebo in a supplementation trial prevents the subject from knowing whether he or she is receiving the substance or not.

*Were inclusion/exclusion criteria and key information on the characteristics of the study population provided?* For instance, were healthy or high-risk subjects allowed to take medications that can affect the disease that is subject of the claim during the study? If so, was the proportion of subjects taking medications similar between the control and intervention groups?

*Was subject attrition (subjects leaving the study before the study is completed) assessed, explained in the article reporting the study, and reasonable?* If there were a marked number of drop-outs, then it would be important to know why subjects dropped out and how the drop-outs affected the number and composition of the intervention and placebo group.

SECOND AMENDED COMPLAINT

*How was compliance with the study protocol verified?* Intervention studies should include a mechanism for verifying that the subjects followed the study protocol. For example, a supplementation trial should have a mechanism for determining how frequently the subjects took their supplements. It would be important to know 1) if the subjects took all of the supplements provided by the study or only a portion and 2) what proportion of the subjects for each group took less than the directed amount.

*Was statistical analysis conducted on baseline data for the all subjects initially enrolled in the study or only those who completed the study?* If there were a marked number of drop-outs which, in turn, affected the composition of the intervention groups differently from the placebo groups, then it would be important to determine if statistical analysis on baseline data was conducted for all subjects initially enrolled in the study or only for those who completed the study.

*Did the study measure disease incidence or a surrogate endpoint of disease risk?* While surrogate endpoints of disease risk have been validated, they are not as accurate as measuring the actual onset of a disease. This quality issue would also apply to observational studies.

*How was the onset of a disease determined*? When disease incidence is the endpoint being measured, it is important that the disease that is subject of the claim is confirmed either through medical records and/or pathology reports. Relying on less specific records, such as death certificates, is not sufficient. This quality issue would also apply to observational studies.

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9

*Was there an adequate adjustment for confounders of disease risk?* Several aspects of a substance/disease relationship may give rise to confounders. Therefore, it is important to adjust for confounders of the disease of interest so that observed effects on risk of disease that may be due to confounders are not incorrectly attributed to the substance of interest. For example, there can be multiple non-dietary risk factors for a disease (e.g., smoking, body mass index, and age for hypertension). Therefore, when evaluating the relationship between sodium and blood pressure, an adjustment of the risk analysis should be made based on age, smoking, body mass index and age.

10
11
12
13
14

*What type of dietary assessment method was used to estimate dietary intake?* Validated food frequency questionnaires are more reliable in estimating "usual" intake of foods compared to diet records or 24-hour recall methods. See Section III.B.

15
16
17

*Guidance for Industry: Evidence-Based Review System for the Scientific Evaluation of Heath Claims*, January 2009 (https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-evidence-based-review-system-scientific-evaluation-health-claims) (last accessed October 21, 2020).

18
19
20
21
22
23
24
25
26
27
28

50.    It thus does not appear there are multiple, let alone any, publicly available studies conducted on the Products that would satisfy the industry accepted standards for using the specific terms clinical tests and clinical studies, as there is no citation by Defendants to any well-designed, well-conducted, double-blind, randomized controlled clinical trials by a truly independent third party without a vested interest in the outcome, let alone multiple studies, and the single study referenced by Defendants would not meet the requirements of the level of proof sufficient to satisfy the relevant scientific community as to the claims at issue. And while Defendants further claimed that Organifi Green Juice contains a blend of "USDA organic" superfoods that are claimed by Defendants to reduce stress, improve skin, boost overall health, and other attributes, they do not

reference any clinical trials or studies that provide the requisite link between those food items at the levels contained in the Product and in combination and those particular physical benefits.

51.    In addition, the regulatory Compliance Officer for Organifi who would be in charge of overseeing such claims, Marcus Bradley, appears to have no training on FTC and FDA compliance for determining whether it is proper or legal for Organifi to be making such claims. Rather, he was promoted from customer relations to that position less than two years ago, with no apparent additional training. Thus, Organifi does not appear to have in place procedures and processes to ensure compliance with state and federal laws as to the making and reference to such claims, as evidenced by the significant violations of industry standards set forth above.

52.    In addition, according to the Product's website, Organifi Green Juice has been featured on several popular networks and in large publications such as Dr. Oz, NBC, the LA Times, FOX, and more. However, there is no third-party verification that Defendants or the Products had appeared or been featured on any of these media outlets, possibly other than their own paid infomercials or advertisements. In addition, Organifi claims on its website their Green Juice was "voted #1 best tasting greens powder on the market," although there is no indication when this occurred, or who actually issued that award, and no indication this statement is based on anything other than conjecture. These are separate and independent false or misleading statements.

53.    If manufacturers make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled and that label claims are truthful, accurate, and backed by scientific evidence.

54.    The types of misrepresentations made above would be considered to be material by a reasonable consumer when deciding to purchase the Products.

55.     The failure of Defendants to comply with the labeling and promotional requirements of both the Sherman Law, Section 321(m) of the FDCA, the Nutrition Labeling and Education Act of 1990 (Publ L. 101-535, 9 U.S.C. Section 301 et seq.) and 21 C.F.R. § 101 *et seq* in terms of claiming clinical studies exist when they do not, render the Products "misbranded" as a matter of California and federal law. Misbranded products cannot be legally sold and are legally worthless.

56.     Food manufacturers are required to comply with identical federal and state laws and regulations that govern the labeling of food products, including those set forth in 21 C.F.R. § 101 *et seq*. Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." California Health & Safety Code § 110100.

57.     In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. For example, a food product is misbranded under California Health & Safety Code § 110660 if its labeling is false and misleading in one or more particulars.

58.     Pursuant to Health & Safety Code § 110825, the sale of such a misbranded product constitutes a criminal act punishable by up to twelve months in jail. As a result, the injury to the Plaintiff and Class members arise from the Defendants illegally selling the Product they misbranded, the sale of which is a criminal act. Plaintiff and the Class have been unlawfully deprived of money in an illegal transaction and under a series of illegal contracts that occurred because the Defendants sold them a product that could not be legally sold or possessed. Due to the Sherman Law's prohibition of possession of such a product, consumers have

been unwittingly placed, solely and directly by Defendants' conduct, in a legal position that no reasonable consumer would choose. Consumers have thus been directly injured by the Defendants' illegal act of unlawfully selling them an illegal product. This harm goes beyond mere economic injury by a product they could not by law legally purchase. Such illegal sales constitute a series of illegal contracts and as such are voidable and entitle Plaintiff and the Class to damages and restitution under the common law and numerous statutory provisions, including the provisions of law and the Causes of Action referenced herein.

59.   Defendants have violated California Health & Safety Code § 110390, which makes it unlawful to disseminate false or misleading food advertisements or statements on products and product packaging, labeling or any other medium used to directly or indirectly induce the purchase of a food product.

60.    Defendants have violated California Health & Safety Code § 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely advertised food.

61.   Defendants have violated California Health & Safety Code §§ 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised.

62.   Defendants have violated California Health & Safety Code § 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

63.   Defendants' Products are misbranded under California Health & Safety Code § 110755 because they purport to be or are represented to be able to address or ameliorate certain conditions based on the results of numerous clinical studies and trials that do not exist, and their labels fail to bear information as necessary in order to fully inform purchasers as to their value.

64.   Defendants have violated California Health & Safety Code § 110765, which makes it unlawful for any person to misbrand any food.

65. Defendants have violated California Health & Safety Code § 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

66. Defendants have violated California Health & Safety Code § 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold or offer for sale any food that is misbranded.

67. Plaintiff's and Class members' purchases of the Products damaged them because misbranded products cannot be legally sold, possessed, have no economic value, and are legally worthless. No reasonable consumer, including Plaintiff, would purchase a product if they knew such product was illegal to buy or possess. Because these products are illegal to possess under California law as they are falsely advertised, misbranded and/or mislabeled, they have no economic value and are legally worthless. The sale of misbranded products is illegal under federal law as well. Thus, when Plaintiff and the Class purchased an illegally misbranded product and thereby entered into a series of illegal contracts, there is causation and injury even absent reliance on the misrepresentations that misbranded the Product. The unlawful sale of misbranded food products that are illegal to sell or possess as a matter of express statutory law pursuant to Health & Safety Code § 110760 and the other laws cited above – standing alone without any allegations of deception by Defendants other than the implicit misrepresentation that the Products are legal to sell or possess, or any review of or reliance on the particular labeling claims -- gives rise to Plaintiff and the Class members' right to recover as a result of these illegal sales.

68. Further, Defendants acted unlawfully, unfairly, unethically and in a misleading manner when they unlawfully sold misbranded food products that were illegal to possess and that when purchased by Plaintiff and Class members potentially exposed them to criminal prosecution and penalties. Therefore, Defendants' injury-causing unlawful conduct is the only necessary element needed

to establish liability. All Plaintiff needs to show under California law is that they bought an unlawful product that they would not have otherwise purchased absent the Defendants' failure to disclose the material fact that the product was unlawful to sell or possess. This claim does not sound in fraud; instead, it alleges strict liability pursuant to the above cited provisions of the Sherman Law, the analogous provisions of the FDCA and California's laws relating to unknowingly entering into illegal contracts.

69.    Plaintiff read and reasonably responded and acted in positive response to the labels and Organifi website claims. He reasonably believed the efficacy of the Products was established by numerous clinical studies and trials that were supported by a prestigious medical university and published on a prominent government website for clinical trials. Plaintiff based and justified his decision to purchase the Products and paid money therefor, in substantial part, on the label and website statements referenced herein.

70.    Plaintiff did not know, and had no reason to know, that the Products were unlawful and misbranded as set forth herein, and would not have bought the Product had he known the truth about it, i.e., that the Product was illegal to purchase and possess. After Plaintiff learned that the Products were falsely labeled, he stopped purchasing them.

71.    However, while Plaintiff is aware of the misleading nature of Defendants' current advertising, as he continues to desire to improve his health and would order such Products or reformulated Products in the future if, in fact, Defendants conducted truly independent clinical studies of the effectiveness of the Product or any reformulated Product, or disclosed other truthful information about the Products' component ingredients and/or scientific proof that correlated to the constituent product levels. Defendants have yet to change their labeling and advertising practices, reformulate or improve the Product to conform to their advertising claims, or apparently conducted a truly independent clinical trial of the

Product. Given Defendants' ongoing business acts and practices, Plaintiff will be unable to rely on the Product's advertising or labeling in the future, and so will not purchase the product although he would like to. As a result, Plaintiff has standing to seek injunctive relief. In addition, as a person who has lost money or property as a result of Defendants' unlawful, unfair and fraudulent business acts and practices, by law Plaintiff has standing to seek injunctive relief for the benefit of the general public pursuant to *McGill v. Citibank, N.A.,* (2017) 2 Cal. 5th 945, 959-60 ("We conclude that these provisions do not preclude a private individual who has "suffered injury in fact and has lost money or property as a result of" a violation of the UCL or the false advertising law (Bus. & Prof. Code, §§17204, 17535)—and who therefore has standing to file a private action—from requesting public injunctive relief in connection with that action.")

72.    Defendants' labeling as alleged herein is false and misleading and was designed to increase sales of the products at issue. Defendants' misrepresentations were and are part of their systematic labeling practices. A reasonable person would attach importance to Defendants' misrepresentations in determining whether to purchase the Products at issue. A reasonable person would also attach importance to whether Defendants' products are "misbranded," i.e., legally salable, and capable of legal possession, and to Defendants' representations about the Products being supported by multiple clinical studies and trials that apparently do not exist. Plaintiff and others would not have purchased Defendants' products had they known they were not capable of being legally sold or held, or that in fact there were not numerous (if any) clinical studies or trials that supported the efficacy of these Products, or that such studies were not in fact supported or overseen by a prestigious medical university or available on a well-known government website that compiles clinical trials.

73.    Defendants' advertising and marketing as alleged herein were similarly designed to increase sales of the Products at issue, and a reasonable

person would attach importance to Defendants' misrepresentations and material omissions in determining whether to purchase the Products at issue. A reasonable person would also attach importance to whether Defendants' Products were legal for sale, and capable of legal possession, and to Defendants' representations about the existence of clinical studies and trials in determining whether to purchase the Products at issue.

74. Consumers' response to this campaign has been incredibly positive and successful. According to Organifi's Chief Marketing Office Amy Jo Beaver, since 2016 Organifi has grown from sales of approximately $18 million a year to over $50 million a year, over 96% of which results from promoting its products such as the Products online and through both its websites and other websites Mr. Canole controls. She also claims that Organifi has been identified as one of the 500 fastest growing companies by Inc. Magazine three years in a row.

75. Mr. Canole and his company are sophisticated e-commerce participants who likely know what facts are material to consumers and the importance of claiming that there is independent clinical support for their claims. Ms. Beaver claims to have over 30 people working on developing e-commerce marketing strategies to promote the Products, which would necessarily include claims about the Products being supported by clinical studies and trials as made by Mr. Canole. Defendants use Facebook, Instagram, YouTube, and other media agencies and sources to reinforce the claims asserted herein. Merely clicking on a link for Organifi results in consumers receiving unsolicited advertisements delivered on Facebook, on cell phones and other devices, showing the sophisticated pervasiveness and knowledge of what is contained on their websites. Their corporate representatives also claim to have used strategies such as split tests on website landing pages and upsell pages, which would determine what types of claims will draw consumers to Organifi's sales pages and to purchase the Products. Thus, Defendants cannot reasonably claim that the links to these studies were

inadvertently missing or were erroneously referenced. Based on this sophisticated online marketing strategy, if such studies existed Defendants could easily make them readily available. They also either knew or should have known that key links to the studies that they represent existed are not present because they would have tested such pages prior to release. Since the receipt of Plaintiff's demand letter referenced below they did not apparently correct this error, nor did they offer to provide evidence that such clinical studies or trials actually existed or were readily and publicly available.

76.    Prior to filing this action, Plaintiff made a request in writing dated May 8, 2019 that Defendants provide an appropriate correction, replacement or other remedy to all persons who purchased the products in question and requested Defendants provide evidence that such clinical studies and/or trials actually exist based on the lack of any evidence that studies of these Products are available, and sent that demand to Defendants via certified mail, return receipt requested. More than 30 days have elapsed since Defendants received this written notification, as well as a follow up letter after Mr. Bradley contacted counsel in response to this letter to discuss this issue (counsel's attempts to contact Mr. Bradley were ignored).    Defendants failed and refused to produce such evidence, and as indicated above no such evidence appears to exist. Nor did they provide a refund of monies to Plaintiff or offer to do so for anyone else. Thus, Defendants have failed and refused to timely take any requested action on behalf of Plaintiff and all Class members, necessitating these claims on behalf of both Plaintiff and the Class and/or for the benefit of the general public.

SECOND AMENDED COMPLAINT

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**BREACH OF THE IMPLIED WARRANTIES OF MERCAHNTABILITY AND FITNESS FOR PARTICULAR PURPOSE**

77.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs above.

78.    Defendants, as the designer, manufacturer, marketer, distributor, promoter and/or seller of the Products, by law provided implied warranties of both merchantability and fitness for a particular purpose.

79.    Defendants breached the implied warranty of merchantability, which by law (including, inter alia, Cal. Comm. Code § 2314) is provided for the exclusive benefit of consumers in connection with agreements for the sale of the Products.

80.    The term "merchantability" has several meanings, and only some of those meanings involve determining a minimum level of quality for the product, as compared to not having the quality that a reasonable buyer would expect.

81.    There are five separate alternate and independent aspects of an implied warranty of merchantability:

(a)    the Products could not pass without objection in the trade under the contract description if they are missing a key promoted characteristic of the Product and thus were not of the same quality as similar products generally acceptable in the trade and conformed to the standard performance of like products in the trade that are represented as being supported by clinical trials. As set forth in detail above such characteristics are missing in the Product in terms of not being supported by clinical trials and not providing the represented efficacy and benefits, as well as in terms of the Product not being able to be sold in and from California as a misbranded or mislabeled product;

(b)    the Products were not of fair average quality within the product description if they do not conform with the representations and descriptions. As set forth in detail above, they do not as they do not conform to the product descriptions in terms of not being supported by clinical trials and not providing the represented efficacy and benefits, as well as in terms of the Product not being able to be sold in and from California as a misbranded or mislabeled product

(c)    the Products were not adequately advertised, packaged, and/or labeled and omitted material facts to the contrary, which they did not for the reasons set forth in detail above in terms of not being supported by clinical trials and not providing the represented efficacy and benefits, as well as in terms of the Product not being able to be sold in and from California as a misbranded or mislabeled product;

(d)    the Products were not fit for the ordinary purposes for which such goods are used, specifically in terms of being a supplement that provides specific benefits and that is supported by independent clinical trials, and can be lawfully sold in and from California; or

(e)    the Products did not measure up or conform to the promises or affirmations of fact made by Defendants contained on the Product labelling, packaging and/or advertising to the extent referenced in the labelling, which as set forth above include being supported by "countless" clinical trials published in nationally recognized government clinical trial websites and undertaken by a prestigious university, and not being lawful to sell as being misbranded and mislabeled under California law.

If a product does not live up to the statements about the Product made by the seller and actually fails to provide the promised benefits, it does not meet the implied warranty of merchantability. The Products are not reasonably suitable for

the ordinary uses and purposes of goods of the general type described by Defendants and are not capable of passing in the market under the description by which they are sold; i.e. products that are supported by independent clinical trials, provide the promised benefits in terms of component levels that are comparable to the cited studies, and can lawfully be sold in and from California. As such Products are not saleable for the general uses and purposes of goods of the kind described, the Products do not meet any of these five independent tests of "merchantability" for the reasons set forth above.

82.    As to alternative (d), in order to assert a claim that a product fails to meet the requirements of the implied warranty of merchantability, such failures must affect the core functionality of the Products and thus not be fit for the ordinary purposes for which such goods are used. The failures alleged herein qualify in terms of Green Juice not being a "juice", being unable to provide the basic promised benefits of a nutritional supplement, and being unable to be sold in and from California as a mislabeled and misbranded product, thus failing to meet a minimum level of quality that would reasonably be expected for such products.

83.    In addition, and as a separate basis to assert a claim for breach of the implied warranty of habitability, the failures set forth above constitute a latent defect in the Products that existed at time of purchase for the reasons described above but was undiscoverable at time of sale. If these defects were known the Products would not have been saleable for the reasons set forth above and would not measure up to the descriptions of the Products given by Defendants. This separately renders the Products unmerchantable. This warranty of merchantability was thus also breached by the existence of an unseen defect at the time of sale, rather than upon its subsequent discovery.

84.    Plaintiff and Class members thus did not receive goods as impliedly warranted by Defendants to be "merchantable", as these products are missing a key characteristic, including being supported by independent clinical test results,

having non-comparable ingredient levels as compared to cited clinical trials and the precise use contemplated for the Products – the ability to be lawfully sold in and from California and used for their represented purpose. The Products failed to perform as represented and did not and does not provide the purported benefits of the Products.

85.     Defendants also breached the implied warranty of fitness for a particular purpose as provided by law, including, *inter alia,* Cal. Comm. Code § 2316. Plaintiff and Class members purchased the Products for a particular purpose (*i.e.*, was a product that was supported by clinical studies and was efficacious for health management, weight loss, increased heart health and depression). Because of the particular purposes and advertised characteristics, Plaintiff and Class members could be reasonably expected to rely upon Defendants' skill and judgment in furnish goods suitable for this particular purpose and that were lawful to sell, and thus would have no reason to believe to the contrary. As Plaintiff and other Class members would have no reasonable way to know whether these Products were supported by properly conducted clinical trials, Defendants had reason to know that these buyers were relying on the skill and judgment of Defendants to furnish suitable goods that would satisfy this particular purpose. As the alleged benefits of the Products were a represented particular purpose and characteristic of the Products, Defendants had reason to know of the particular purpose of these purchases, and that purchasers would be relying on their skill and judgment to ensure these Products could be lawfully sold in and from California, and could provide the stated benefits.

86.     Plaintiff and Class members purchased the Products from Defendants or their agents, who were in the business of selling these Products to consumers.

87.     The Products were not altered by Plaintiff or Class members.

88.     The Products did not conform to these implied warranties when they left the exclusive control of Defendants.

89.    Defendants either were or should have been aware that the Products would be purchased and used by Plaintiff and Class members without additional testing. In addition, based on the nature of the misleading information set forth above, Defendants either were or should have been aware that these Products could not be sold in and from California and could not conform to these implied warranties.

90.    Plaintiff and Class members did not receive these Products as impliedly warranted for the reasons set forth above and thus were harmed. The failure of such Products to have the represented qualities set forth above, including the ability to be lawfully sold and possessed in and from California, was a substantial factor in causing such harm.

91.    All conditions precedent to seeking liability for breach of these implied warranties have been performed by or on behalf of Plaintiff and Class members in terms of paying for the goods at issue and Defendants having been placed on reasonable notice of these breaches within a reasonable time after such breaches were discovered that the Products did not have the expected qualities set forth above, and having been given an opportunity to cure these breaches as to Plaintiff and all Class members and provide compensation to them prior to asserting this claim in this action. Defendants have failed to voluntarily offer to take sufficient remedial measures, or otherwise provide appropriate and complete relief at no cost to Plaintiff and Class members.

92.    As a direct and proximate cause of Defendants' breaches of implied warranties, Plaintiff and Class members have been injured and harmed, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

93.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs above.

94.    The advertisements for Defendants' Products, examples of which are set forth above, where Defendants have claimed that the Product has been proven to be effective based on studies published in nationally recognized government clinical trial websites and undertaken by a prestigious university and/or is supported by multiple clinical trials and/or studies, and are lawful to be sold in and from California as being made available on their company website or those controlled by Mr. Canole, constitute express warranties that the Products will conform with those represented claims and characteristics. Such statements about a particular product characteristic constitutes a description of the Products that are made part of the basis of the bargain.

95.    However, as set forth above, the Products at issue do not conform to the represented description and characteristics of the Product that Defendants claim existed and were part of the basis of the bargain, breaching the terms of the express warranty created by such advertisements.

96.    Plaintiff made written demand on behalf of himself and all Class members for an appropriate correction, replacement or other remedy for breach of written warranty prior to filing this action. However, Defendants have failed to offer to provide refunds to Plaintiff and all other Class members in response thereto.

97.    Plaintiff and Class members have been damaged by Defendants' failure to comply with their obligations under express warranty, in an amount according to proof at time of trial.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE §§1750, et seq. ("CLRA")

98.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs above.

99.    Defendants' actions, representations, omissions, and other conduct are subject to the CLRA, because they extend to transactions that have resulted or were intended to result in the sale and provision of goods or services to consumers.

100.    Plaintiff and Class members are "consumers" within the meaning of Cal. Civ. Code §1761(d).

101.    Defendants' sale of the Products at issue are a "good" within the meaning of Cal. Civ. Code §1761(a).

102.    Defendants are "persons" under Cal. Civ. Code §1761(d).

103.    By misrepresenting and failing to disclose the material facts set forth above in terms of claiming that the benefits and efficacy of the Product had been established by numerous clinical trials and/or studies when there appears to be no such support nor a study that actually would qualify as a clinical study, that such studies were published in nationally recognized government clinical trial websites and undertaken by a prestigious university when neither is the case, and that such transactions were lawful when in fact because the Products were misbranded they were prohibited by law to be sold in and from California, Defendants violated, inter alia, Cal. Civ. Code §§1770(a)(2), (5), (7), (14) and/or (16).

104.    Defendants also actively concealed and continued to conceal the material facts about the lack of clinical support for their marketing claims, and continue to fail to make full disclosure of the nature and extent of these material misstatements even though they had a duty to disclose the facts that such information does not appear to exist. Further, Defendants acted unlawfully, unfairly, unethically and in a misleading manner when they unlawfully sold misbranded food products that were illegal to possess and which when purchased by Plaintiff and the Class members potentially exposed them to criminal prosecution and penalties, and either misrepresented or failed to disclose these material facts to consumers. In addition, having spoken on the issue, Defendants undertook a duty and obligation to speak completely and truthfully on this issue

and inform consumers of all material facts, and offer an appropriate correction, replacement or other remedy to them once the true facts were known.

105.    Such misrepresentations and omissions of material fact violated Civil Code §§1770(a)(2) (Misrepresenting the sponsorship, approval, or certification of goods); (5) (Representing that goods have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that they do not have); (7) (Representing that goods are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another); (14) (Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law); and/or (16) (Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not).

106.    The relevant question is whether a reasonable consumer would attach importance to Defendants' claims that the efficacy of the Products were established by numerous clinical trials and "clinical studies" that in fact were not clinical studies at all for the reasons set forth above, that such studies had been published as Defendants represented, not whether the statements had been evaluated or endorsed by any particular government agency. Based on the importance of such claims and the established statutory requirements for asserting claims that are supported by multiple clinical studies or testing and not selling misbranded products that would result in criminal conduct, these misrepresented and omitted facts would be and are presumptively material to a reasonable consumer. Such misstatements and omissions were also material because if Plaintiff and the Class members had been fully informed of these material facts, including that the Products were not lawful to purchase or sell, they would not have purchased the Products or paid the prices they did.

107.   Plaintiff and Class members reasonably acted in positive response to such misrepresented and material facts by purchasing the Products at issue at the prices they did. Plaintiff and Class members are likely to have been deceived by such conduct, as they would not be able to reasonably ascertain that the efficacy of the Products was not supported by numerous or countless clinical trials published in nationally recognized government clinical trial websites and undertaken by a prestigious university, and that the Products were not lawful to sell as being misbranded and mislabeled under California law. The statements by Defendants detailed above were untrue and misleading as they failed to disclose the material facts set forth above.

108.   The material facts Defendants have misrepresented, concealed and/or suppressed concerning the material facts at issue were known and/or accessible to Defendants, who had superior knowledge and access to the facts. Defendants either knew or reasonably should have known such facts were not known to or reasonably discoverable by Class members or the general public.

109.   As a result of the misrepresentation, concealment and/or suppression of these material facts, Plaintiff and Class members did not receive the benefit of their bargain as required by California law. Plaintiff and Class members thus suffered damage in amounts according to proof at time of trial.

110.  Plaintiff has previously provided Defendants with notice of the violations of the CLRA pursuant to Cal. Civ. Code §1782(a). The CLRA provides that a Complaint for violation of the CLRA may assert claims for actual, consequential, statutory and/or punitive and exemplary damages should the violations not be remedied within thirty (30) days of receipt of this written notification. As more than 30 days have elapsed since this notice was mailed and received by Defendants without a cure of Defendants' violations offered to Plaintiff and all other Class members, and as Defendants have refused to provide

such a cure or any offer to do so within a reasonable period of time, Plaintiff asserts a claim for all such damages on behalf of himself and all Class members.

111.   Defendants also should be ordered to pay restitution as well as be enjoined from continuing to employ the unlawful methods, acts and practices alleged herein in order to prevent any future harm to the Class members, and/or for the benefit of the general public pursuant to Cal. Civ. Code §1780(a)(2). Defendants should also be ordered to pay Plaintiff's attorneys fees and costs according to proof.

112.   In addition, Defendants misrepresented, concealed and/or suppressed these material facts, in whole or in part, at the expense of Plaintiff and Class members with the apparent knowledge that numerous truly independent clinical tests or studies did not exist and/or were not readily and publicly available or approved as represented by Defendants and that sales of the Products were illegal and resulted in criminal conduct. As such actions were designed and intended by Defendants to make consumers purchase the Products based on false and misleading claims and would result in potentially criminal conduct, Plaintiff and the Class are entitled to exemplary damages pursuant to Cal. Civ. Code § 1780(a)(4).

## FOURTH CAUSE OF ACTION

## VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE §17200 et seq.

113.   Plaintiff incorporates by reference the allegations contained in the preceding paragraphs above, except any allegations as to entitlement to actual or exemplary damages.

114.   Defendants have engaged and continue to engage in acts and practices of unfair competition, as that term is defined in Business & Professions Code §17200. As used in this Cause of Action, "unfair competition" means an unlawful, unfair or fraudulent business act or practice and false or misleading advertising as

defined under Business & Professions Code §17500. This conduct is actionable pursuant to Business & Professions Code §§17200 and 17203.

115.   Defendants' policies and practices as detailed herein cause substantial injury to consumers with no countervailing legitimate benefit and are immoral, unethical, oppressive, unscrupulous, and unconscionable, and thereby constitute "unfair" business acts or practices within the meaning of the UCL.

116.   Defendants' policies and practices as detailed herein to not notify their customers about the nature and scope of the true facts and making material misstatements and/or material omissions of fact relating thereto as set forth above, all of which are likely to mislead Plaintiff, Class members and the public, constitute "fraudulent" business acts or practices within the meaning of the UCL.

117. Defendants' policies and practices as detailed herein are also "unlawful" business practices in terms of violating, inter alia, the provisions of Cal. Civ. Code §1750, et seq. cited above, systematic breaches of both express and implied warranties, and violations of the numerous provisions of the Sherman Law and identical federal law as set forth in detail above.

118.   Based on the conduct alleged above, Defendants also violated Bus. & Prof. Code § 17500, which makes it unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of personal property or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement concerning that personal property, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known,

to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property as so advertised.

119. As a result of Defendants' unlawful, unfair or fraudulent business practices and untrue and misleading advertising as alleged herein, Plaintiff suffered injury in fact and lost money or property in the form of moneys that he expended for the Product that he would not have paid in the amount he did had the true facts been timely disclosed to him. Meanwhile, Defendants have illegally retained monies that should have been repaid but have not been, unjustly enriching themselves thereby. Thus, in engaging in conduct that constitutes unfair competition, each Defendant has acquired or retained money or property in which Plaintiff and Class members have a vested interest.

120. Pursuant to Business & Professions Code §§ 17203 and 17204, the Court may enjoin such conduct on behalf of the Class and for the benefit of the general public, order the provision of corrective notice, and order Defendants to restore to Plaintiff and Class members any money or property that Defendants may have acquired or retained as a result of any act or practice that constitutes unfair competition in which Plaintiff and Class members have a vested interest. The Court may also order Defendants to disgorge any profits Defendants may have obtained either directly or indirectly from Plaintiff and Class members as a result of this conduct. Plaintiff requests such relief on behalf of himself, the Class and for the benefit of the general public.

121. Plaintiff also seeks the payment of fees and costs pursuant to, inter alia, Cal. Code Civ. Proc. § 1021.5.

# FIFTH CAUSE OF ACTION

## RESTITUTION, MONEY HAD AND RECEIVED, UNJUST ENRICHMENT AND/OR QUASI-CONTRACT AND ASSUMPSIT

122.   Plaintiff incorporates by reference the above paragraphs except as to those for claims relating to breach of warranty, and pleads this claim as an alternative to any claims arising out of breach of contract. This claim is not derivative of the other Causes of Action asserted above, but rather under California is recognized as a separate and independent alternative Cause of Action that may be submitted to the jury.

123.   Plaintiff and the Class members plead just grounds for recovering money for benefits Defendants received from them or failed to pay back to them. Plaintiff claims through this Cause of Action that Defendants must restore to Plaintiff and Class members money that Defendants received from them, but that really should belong to Plaintiff and the Class members as Defendants either knew or had reason to know that the Products did not conform with their represented characteristics and could not lawfully be sold in and from California. The Products thus were sold pursuant to a series of illegal contracts for the reasons set forth above, as the Products were misbranded and mislabeled under the Sherman Law and identical federal law and thus were not lawful to sell in and from California.

124.   Class members conferred a benefit upon Defendants by paying monies for the Products at issue. Defendants, having been unjustly conferred a benefit by Class members through illegal conduct or acts of mistake or fraud as set forth above, and having received such benefits using misleading and illegal acts, practices and policies and omitting material facts as set forth in detail above, are required to make restitution. The circumstances here are such that, as between the two, it is unjust for Defendants to retain such a benefit based on the conduct described above. Such money or property belongs in good conscience to Plaintiff and Class members, and can be traced to funds or property in Defendants'

possession or made as a result thereof. Defendants have received a benefit from Plaintiff and Class members in the form of monies paid by them for the Products at issue, and are unjustly retaining that benefit at the expense of Plaintiff and Class members. The unjustified charging and retention of monies from sales of the Products that were not lawful and were illegal and that passed through Defendants entitles Plaintiff and Class members to restitution of such monies.

125.  Defendants have been unjustly enriched by Class members through payments they had and received from sales of the Products or monies they were able to retain and the resulting profits enjoyed by Defendants from sales of the Products, and Defendants' unjust enrichment is related to and flowed from the conduct challenged in this Complaint. Under California law, one who acquires a benefit may not justly retain such monies and thus must return such monies so as not to be unjustly enriched.

126.  Defendants entered into a series of implied-at-law obligations that resulted in a sum certain as stated above being had, received and/or unjustly retained by Defendants, either directly or indirectly, at the expense of Class members. Defendants had knowledge of such benefits. Defendants owe Class members specific sums that can be calculated based on the records of Defendants. Under established principles of quasi contract and assumpsit under California law, Defendants have an obligation created by law to restore Plaintiff and Class members to their former position by returning the monies paid for the Products they could not lawfully sell and thus are not lawfully entitled to retain. This obligation is imposed by law, regardless of the intent of the parties. Rather, equity and good conscience dictates that under the circumstances Defendants as the benefitted party should make reimbursement of the monies paid for the Products to Plaintiff and Class members. Such monies were received by Defendants and were not intended to be used for Plaintiff and Class members' benefit, but rather for their own personal profit.

127.   Under principles of restitution recognized under the law, an entity that has been unjustly enriched at the expense of another by the retention of a benefit wrongfully obtained or retained at another's expense is required to make restitution to the other. In addition, under common law principles recognized in claims of common counts, assumpsit, unjust enrichment, restitution, and/or quasi-contract, under the circumstances alleged herein it would be inequitable or unjust, as between the parties, for Defendants to retain such benefits, and thus must pay restitution or restitutionary damages. Such principles require Defendants to pay over such benefits when the retention of such benefits would unjustly enrich Defendants. Other remedies and claims may not permit Class members to obtain such relief, otherwise leaving them without an adequate remedy at law.

128.   Pursuant to California Civil Code § 2224, one who gains or retains a thing (including money) by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, unless they have some other and better right thereto, is an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it. Based on the facts and circumstances alleged above, in order to prevent unjust enrichment and to prevent Defendants from taking advantage of their own wrongdoing, Plaintiff and Class members are entitled to the establishment of a constructive trust, in a sum certain, of all monies that have been improperly retained by Defendants as well as the monies made by Defendants on such payments for the Products, from which Plaintiff and Class members may seek restitution.

129.   In addition, in light of Defendants' knowledge of the true facts as set forth above, Defendants' conduct warrants an assessment of exemplary damages under this independent cause of action, in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

130.   Based on the allegations set forth above, Plaintiff and Class members may properly assert an independent Cause of Action for restitution and

restitutionary damages at law through an action derived from the common-law writ of assumpsit, by implying an obligation at law based on principles of restitution and unjust enrichment, based on common counts such as monies had and received and/or through quasi-contract. Plaintiff, both individually and on behalf of the Class, thus seeks appropriate restitutionary monetary relief and exemplary damages as appropriate for sums certain as is permitted by law for such claims.

131.   Plaintiff also requests an order for an accounting and prohibiting Defendants from failing and refusing to immediately cease the wrongful conduct as set forth above and enjoining Defendants from continuing to make the misleading claims at issue herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.   For restitution and restitutionary disgorgement to Plaintiff and Class members in an amount to be determined at trial;

2.   For any direct, consequential, incidental, statutory and/or exemplary damages as permitted for Defendants' violation of the laws identified above, in an amount to be determined at trial;

3.   For costs of the suit and Plaintiff's reasonable attorneys' fees, pursuant to, *inter alia,* Civil Code § 1782 and C.C.P. § 1021.5;

4.   For an injunction against such conduct on behalf of the Class and for the benefit of the general public, and an order for the provision of corrective notice;

5.   For pre- and post-judgment interest at the legal rate; and.

6.   For such other relief as the Court may deem proper.

//

//

//

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action so triable.

DATED: October 22, 2020

_____

Alan M. Mansfield
WHATLEY KALLAS, LLP
16870 W. Bernardo Drive
Suite 400
San Diego, CA 92127
Phone: (619) 308-5034
Fax: (888) 341-5048
Email: amansfield@whatleykallas.com

John W. Hanson, SBN: 214771
THE HANSON LAW FIRM
548 Market St., PMB 53441
San Francisco, CA 94104-5401
Phone: (858) 451-0291
Fax: (858) 451-0281
Email: john@thesandiegolemonlawyer.com

# **DECLARATION OF VENUE**

I, Alan M. Mansfield, declare as follows:

1.     I am one of the counsel for Plaintiff in this action and make this declaration to the best of my knowledge of the facts stated herein.

2.     At all relevant times herein, Defendant Organifi, LLC was and is entity that either has a principal place of business based in San Diego, California, is registered to do business in the State of California, and/or is doing business in the State of California and also in this County.

3.     Some of the transactions that form the basis of this action occurred and at least a portion of Defendants' obligations or liabilities arose in this County, as sales of the Products at issue were made both in and from this County through the Company's websites that are apparently operated out of this County, and shipments of the products that are made from this County.

4.     The Complaint filed in this matter contains a cause of action for violation of the Cal. Civ. Code §§ 1750, *et seq.*, as against Defendants.

5.     Per the foregoing assertions, the CLRA cause of action in this Complaint has been properly commenced in the proper county for trial under the venue provisions of the CLRA and Code of Civil Procedure § 395.5.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was signed this 22nd day of October 2020 at San Diego, California.

Alan M. Mansfield